# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-20101

United States Court of Appeals
Fifth Circuit

**FILED**

February 5, 2015

Lyle W. Cayce
Clerk

FORT BEND INDEPENDENT SCHOOL DISTRICT,

Plaintiff−Appellant,

versus

DOUGLAS A., as Next Friend of Z.A.; JAN A., as Next Friend of Z.A.,

Defendants−Appellees.

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:13-CV-1063

Before SMITH, BARKSDALE, and HAYNES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:*

Fort Bend Independent School District ("FBISD") challenges a ruling holding it responsible for reimbursing the parents of one of its former students,

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-20101

Z.A., for his residential placement under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Because the district court erred in concluding that the residential placement was appropriate, we reverse and render judgment for FBISD.

I.

Z.A. was adopted from a Russian orphanage at age 4. After arriving in the United States and enrolling in one of FBISD's schools, he was diagnosed with attention deficit hyperactivity disorder ("ADHD"). Starting in 2008, FBISD created, modified, and implemented a Section 504 education plan tailored to Z.A.'s ADHD to assist his educational growth.[1] Z.A. attended school, assisted by the remedies outlined in the Section 504 plan, until he began exhibiting more significant mental and emotional disabilities between the eighth and ninth grades.

Z.A. was an eighth-grade student during the 2011–12 school year. In mid-December 2011, he attempted suicide by swallowing pills; he came to school after the attempt and went to the nurse's office. The staff at FBISD also became aware that he was smoking marihuana with his parents' knowledge. Despite his disabilities and marihuana use, Z.A. had been performing with reasonable success at school. He had done well on state-administered standardized tests and had bragged to his teachers that he knew exactly how much effort was necessary to pass his courses.

In January 2012, after the suicide attempt, school officials met with Z.A.'s parents to discuss his Section 504 plan. Z.A.'s mother informed them that he was taking medication for ADHD and depression and was seeing a

---

[1] Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), prohibits discriminating against children on the basis of disabilities in educational settings.

psychologist twice a month.

In March 2012, school officials reconvened to discuss Z.A.'s progress. Z.A.'s parents requested a special-education assessment at that meeting, although they did not receive the consent form necessary for the testing until June. Z.A. subsequently failed three courses and was required to attend summer school. Once the special-education testing was conducted, it was determined that Z.A. experienced significant emotional deficits, involving anxiety and depression, that manifested themselves in school as withdrawal behavior. Nonetheless, Z.A.'s academic achievement was average or above average in every area tested. The evaluators concluded that he could pass his classes with preferential seating, frequent breaks, positive reinforcement, behavior-management plans, and extended times for tests and projects.

In August 2012, an Admission, Review, and Dismissal ("ARD") Committee meeting was held with school officials and Z.A.'s parents to fashion an individualized education plan ("IEP") for Z.A. as required under the IDEA. *See* 20 U.S.C. § 1414(d). The ARD recommended in-class support from special education staff and meetings with the school psychologist once every nine weeks.[2]

After Z.A. entered high school, he refused to complete much of his school work and continued to inform teachers of his aspirations to sell marihuana. When school officials and Z.A.'s parents conducted a status meeting on September 17 to discuss Z.A.'s progress, neither side expressed additional or graver concerns about Z.A.'s emotional or intellectual state; Z.A.'s plans for graduation, vocational school, and college were discussed,[3] and the parents continued to agree with the IEP.

---

[2] The court stated that the recommendation was once a week for nine weeks, but it is undisputed in the record that the actual recommendation was for one hour every nine weeks.

[3] Z.A. did not attend the meeting but, before the meeting, had documented his post-high-school goals with school officials.

3

No. 14-20101

On October 25, before the end of the first nine-week grading period, Z.A.'s parents withdrew him from classes unilaterally and without advance notice and placed him at RedCliff Ascent, a wilderness camp in Utah. Z.A.'s psychologist, Dr. Peacock, testified that he recommended the change to improve Z.A.'s mental-health and substance-abuse issues, classifying the change as a response to an emergency. In November 2012, Z.A.'s parents requested a meeting with the ARD committee, seeking reimbursement of the cost of placing Z.A. at RedCliff. The ARD Committee denied reimbursement.

After being released from RedCliff in January 2013, Z.A. entered Change Academy Lake of the Ozarks ("CALO"), a mental-health facility in Missouri. At some point in his time at RedCliff or CALO, Z.A. was diagnosed with reactive attachment disorder ("RAD"), a condition that CALO specializes in treating.

## II.

Z.A.'s parents filed an administrative complaint against FBISD seeking reimbursement for the RedCliff and CALO placements. Finding that FBISD had failed to provide Z.A. with a free appropriate public education ("FAPE") as required by the IDEA, the hearing officer ordered FBISD to reimburse the parents for part of their expenses at CALO.[4] FBISD sued to reverse the administrative decision; the parents counterclaimed, asking the court to affirm the reimbursement order and award attorney's fees. The court granted judgment for the parents, ordering $7,000 per month in reimbursement for the cost of CALO, $677.60 in transportation costs, and $90,000 in attorney's fees.

The court first determined that FBISD had not made a FAPE available

---

[4] He also found that the RedCliff placement was not eligible for reimbursement, a decision not at issue in this appeal.

to Z.A., which meant that the parents were eligible for reimbursement of a private placement. *See* 20 U.S.C. § 1412(a)(10)(C). Next, the court found that the placement in CALO was appropriate, which is necessary for that placement to be reimbursed. *See Richardson ISD v. Michael Z.*, 580 F.3d 286, 299 (5th Cir. 2009). FBISD challenges both of those determinations.

We review *de novo*, as a mixed question of law and fact, a decision that a placement was appropriate. *Cypress-Fairbanks ISD v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997). Findings of underlying fact are reviewed for clear error. *Id.* The party seeking reimbursement for a private placement has the burden of showing that the placement was appropriate. *R.H. v. Plano ISD*, 607 F.3d 1003, 1016 (5th Cir. 2010).

III.

FBISD challenges both the holding that it did not provide a FAPE and the decision that the CALO placement was appropriate and therefore eligible for reimbursement. We conclude that Z.A.'s parents did not meet their burden of showing that the placement was appropriate. Because this appeal deals only with the order for reimbursement relating to the CALO placement and attorney's fees, that conclusion suffices to reverse and render judgment for FBISD, and we do not reach FBISD's contention that it actually provided a FAPE.

For a residential placement to be appropriate under the IDEA, it must be "1) essential in order for the disabled child to receive a meaningful educational benefit, and 2) primarily oriented toward enabling the child to obtain an education." *Michael Z.*, 580 F.3d at 299. Two factors are crucial: "whether the child was placed at the facility for educational reasons and whether the child's progress at the facility is primarily judged by educational achievement." *Id.* at 301. The court's findings in support of the placement, though the result of a thorough opinion and conscientious effort, did not properly apply *Michael Z.*

in light of the evidence considered as a whole.

First, the question "whether the child was placed at the facility for educational reasons" concerns the motivation of the person making the placement. It reflects the careful balance struck by the IDEA, which aims to ensure that children receive an education but which does not "shift the costs of treating a child's disability to the public school district." *Id.* at 300. The district court, however, relied on evidence showing merely that CALO would "focus on the root cause of *this* student's educational difficulties," namely, RAD. That reliance was misplaced. Whether a placement *will* help the student is properly considered under the first criterion of the *Michael Z.* test. A court must determine whether the student was placed in the residential program for educational reasons; that he actually will realize educational benefits is irrelevant under that factor if those benefits are incidental to the reasons for placing him.

For the RedCliff placement, the evidence uniformly supports the conclusion that the parents placed Z.A. for noneducational purposes; indeed, the court found that he was placed at RedCliff because his parents were concerned that he would make another attempt at suicide and because he had a drug problem. There is, however, no evidence showing that they then enrolled Z.A. at CALO for educational reasons. The court's contrary finding is unsupported by the evidence. Although this is only one factor in evaluating the appropriateness of the placement, it serves an important role in maintaining the circumscribed nature of the reimbursement requirement.

The second factor identified in *Michael Z.*, "whether the child's progress at the facility is primarily judged by educational achievement," ensures that the residential program defines its own mission as primarily educational. Measuring progress by educational achievement instead of disability treatment is strong evidence of the placement's purpose and goals, ensuring that the school district is being made to reimburse a program designed to remedy

the district's failure to provide a FAPE.

The court did not make a finding relating to this factor, choosing instead to "place[ ] little weight" on it for a lack of evidence. The evidence, however, plainly supports finding that Z.A.'s progress was not judged *primarily* by educational achievement. Dr. Ken Huey, CALO's founder, stated that education is "a huge piece of what [CALO] is trying to do" and that it "work[s] really hard on the schooling." But he also testified that the number one goal at CALO was treating RAD, and he expressly disclaimed that education was the primary focus and explained that discharge from CALO depends on progress in treating RAD, not progress in educational achievement. It is possible that Z.A. would have been unable to get an educational benefit without a certain level of success in treating RAD, but this factor looks at whether progress is judged primarily by educational achievement; measuring progress by success in treating the underlying condition, on the theory that such progress will eventually yield educational benefits as well, is insufficient.

The court placed great emphasis on its determination that many of CALO's services were "related services" under the IDEA, a label that describes the broad range of services for which a district may be required to offer reimbursement. Whether the residential placement provides related services is an appropriate factor to consider in determining whether a residential placement was appropriate, *id.* at 301, but it is not outcome-determinative; it merely "inform[s] other factors a court may consider in determining whether the placement is primarily oriented toward enabling a child to obtain an education." *Id.* A court must still conduct "analysis of the services as a whole" to determine the placement's primary orientation. *Id.* "Related services" enumerates particular services that are eligible for reimbursement, *see* 20 U.S.C. § 1401(26), and the presence or absence of related services in a placement can be evidence of its purpose. But for a residential placement to be appropriate, it requires

No. 14-20101

more than just the inclusion of educational services, hence the broader analysis.

Even if the court was correct in finding that CALO's program included many related services, the court erred in its application of the *Michael Z.* factors and in making its findings. The record as a whole provides scant support for the CALO placement's being primarily oriented toward an education. In light of the evidence of the noneducational focus of CALO and the parents' burden to demonstrate the appropriateness of the placement, the district court erred in concluding that the placement was appropriate.

The judgment is REVERSED, and judgment is RENDERED for FBISD.